The last case on the argument calendar this morning is Finova Capital Corp. v. Arledge, et al. May it please the Court. Ryan Lurek, on behalf of the appellants, Richard A. Arledge, Inc., Richard Arledge and Peggy Arledge, who are with me in the courtroom today, would like to thank the Court for your time and attention to this matter. As the Court is aware, my clients have raised several appellate issues from the four-day trial below, and I think this case begins with the minimum net cash flow covenant issue. Why is that? I was – as I understand at least one position of the appellees, it's that that all doesn't matter because there was a breach in the failure to cure, and whatever the results of the failure to cure, it's the same as any mistake that was made with respect to the minimum cash flow, so it doesn't matter whether the minimum cash flow is right or wrong. There was a breach, and why do we have to worry about this? And this is in your favor, it seems to me. I mean, there was a breach in the failure to cure and which resulted in not providing the $34,000 and maybe in not allowing the loans to be sold, and it doesn't matter whether it was an earlier breach, it's immaterial. Well, and I appreciate that. However, I think that the issue goes to the materiality of FANOB's cumulative breaches. Why? Well, because we're not talking about an isolated event. All of these things happen in a chain. The first such event was FANOB declaring a default when my client believed none existed, and I think my client proved it. But it declared a default when it shouldn't have because it declared a default without giving you a chance to cure. So the first default was no good, no matter what. Why does it matter if it was no good for two reasons or for one reason? Because the cumulative effect of that as it steamrolled along created a material breach of the contract. If they had just declared that in isolation, I don't think I'd be standing here today saying that was a material breach of the contract. But you coupled the declaration of the default with the failure to give an opportunity to cure and then failure to give an advance. Now, you say failure to give an opportunity to cure. Let me understand if I got this right. The first letter was sent out, I think, on May 7, 2002. Correct. And FANOVA maintains that this was non-curable, which was a misreading of the contract. I mean, the finding of the district court is no, it was curable, at least under the contract. It could have been cured, so FANOVA is wrong. Your client, according to the evidence, says, well, tell me what your figures are. And FANOVA really doesn't say exactly what their figures are. On the other hand, I don't see any attempt by your client to say, well, here are my figures and here's a check for $50,000, which will more than cover it, because the way he could have cured was by providing his own funds, which would then be cash flow. That counts as net positive cash flow. He could have put $50,000 into the business and said, listen, you say I can't cure, but as I read the contract, I can cure. I just did it. But your client never did that. Why didn't he do that? And what's your reason for saying that, you know, despite the possibility of curing, he didn't? Well, the court found that he was prevented from curing, but to Your Honor's question Where did the court say he was prevented from curing? Well, it was in the summary judgment order, which found that the covenant was curable. Well, I saw that part, but where does the court say he was prevented from curing? I can find the site for Your Honor. I'd like to save a little bit of time for rebuttal, and I'll find that site for Your Honor. But my client didn't have the obligation to monitor the covenant, and in fact, he had not monitored the covenant. So simply putting in some sum of money that he doesn't know whether or not it cures would have been a catch-22, because if he got lucky with the number that was sufficient to satisfy the covenant, then he could say, hey, we cured. But if he was a dollar short, Finova would be up here saying, look, he attempted to cure, and he missed it, therefore. We have no appeal from the other side on either the question of whether there was an obligation to cure or whether there was a neuroneous default issued because they didn't give you the opportunity to cure. Right? So that's given in the case at this point, that they should have given you a chance to cure, they didn't give you a chance to cure, and they issued a default in error because of it. So is that all we need to know to go forward from there on and just let's not worry about what happened before that? I agree. But I think that it's material when the Court decides whether or not the cumulative effect of all of the conduct that Finova did through this period of time was a material breach of the contract or not. And that's why it's in there. It's a factual finding that is necessary, I think, to support a conclusion of law that it was ultimately a material breach of the contract. Well, but there was only one default, right, at that point. There were later defaults. But there was only one default declared as a result of the sequence of events at that point. So that has to be the material breach or not be the material breach, the default and the results of the default. And there was only one of them. So why does it matter if there were two reasons or one reason for it? It was an erroneous default. It was a default and breach of contract. And we can just say was that material or not. I agree on that point. However, from there you have the failure to give an advance under the loan. Right. And that's based solely on the supposition that a default existed on the minimum net cash flow covenant. Okay. Then, coupled with all of this, at the same time, you have FANOVA's refusal to address Arledge Motor Company's request to sell leases. Okay. Which Arledge Motor Company said we will use this money to pay down the debt and then free up the loan space so that then they could use that money towards financing new cars. The district court's finding, as I understand it, is that the $34,000 didn't matter because you would have had to pay it back the next day because of the advance situation. Is that right? That is what the court found. Okay. We disagree with that finding because, coupled with that $34,000 cash advance, was a $36,000 transfer from the inventory line to the receivable line. And when FANOVA refused that advance, and it was a $70,000 advance request, $36,000 was a transfer between lines, $34,000 was going to be cash going from FANOVA to Arledge Motor Company. When FANOVA refused that advance, Arledge Motor Company was immediately in default under its receivable line of credit. And that's inappropriate. Obviously, Mr. DeWitt agreed at trial that the purpose of the loan was to fund money to the borrower. When FANOVA refused to fund that money, it destroyed the purposes of that loan contract. And up until that point in time, my client had complied completely with all of his obligations under the contract. Keep in mind, even after the May 7th default letter, at the end of that month, my client paid his over-advanced payment and interest payments under the contract. It wasn't until after. See if I can understand what you're saying. So you're saying essentially the $34,000 doesn't matter. What matters is the other, the rest of the request, which was for another 36, that would have been transferred to the receivable line? They both matter, to be candid with Your Honor. But the $36,000 resulted in a default under the contract because of the receivable line balance. The $34,000 was going to be utilized by my client to purchase new vehicles, which enabled it to generate new leases, which is the heart and soul of its business. But you dispute the finding that the $34,000 was immaterial because you were essentially overdrawn anyway and would have had to pay it right back. But you dispute that as a factual matter. Correct. Because that's how the court couched it below, was the refusal to advance the $34,000 was not self-funded under the contract. But what's the reason why that's wrong? Why is that wrong? Because that prevented my client from generating new business. But why is it wrong? Why is what the district court said wrong? That is, that it wasn't material because it would have had to be repaid right away, presumably before anybody could have generated any business with it. But you have a reason why you don't think that's correct. So what's the reason? I believe I'm understanding Your Honor's question. It's because it was material to my client's business to take that money and generate new leases. Without that money, all it's left with is collecting the receivables. And so the judge was wrong in saying that he really couldn't have generated more releases because, in fact, that amount of money would have had to be repaid immediately anyway. So there was no time to generate. That's what I understood him to be saying. Well, there's a 10-day period of time. My client had a deal to purchase cars with that $34,000. The advance would not have had to have been paid back until 5 days after the end of the month. There was a 15-day period. I see. So the next day is wrong. It would have been a while. Correct. It wasn't the next day. It's at the end of the month that it's determined what the amount is, and then my client has 5 days to pay it. What am I to make of the refusal of your client to submit to an audit? I gather that was a breach of the contract? Finova alleges that was a breach of the contract, correct. I don't believe that that was material. At the time, Finova had requested and performed an audit just shortly before the May 7th default letter was issued in April. It had access to all of the books and records. My client's position at that time was, and keep in mind, the time the audit was requested, my client had initiated a lawsuit as a plaintiff in state district court in Texas against Finova based upon the minimum net cash flow issue. So my client at that point in time said, because of all these things that you've done, and the audit came after the request for the advance was denied. My client said, based upon all the things that you have done and that you have destroyed this contract, I'm not going to grant you an audit, and I want a judge to decide what's going on in this case. So I don't think it was material to the contract that my clients did not grant that audit in June of 2002. Did I answer Your Honor's question? Yes, you did. But I'm – and what attitude did the district court in this case take to that refusal to grant the audit on the 26th of June? Well, ultimately, I think the court coupled that with all of the other defaults that Finova alleged occurred, keeping in mind all of those occurred after the request for advance was denied and the other breaches that the court found had occurred. I mean, the court didn't really deal with one of those individually in its final order. Now, in the procedural history of the case, the court did grant a TRO allowing Finova to complete an audit. So if you had – I mean, your ultimate position, as I understand it, the reason it matters if this first breach was material is because if the first breach was material, then essentially you were entitled to walk away from the contract and all the ensuing defaults weren't defaults because it wasn't a contract. Is that essentially what your position is? No. My client's not maintaining that because of the first breach was declared when Finova didn't know what the calculation really was, it didn't entitle my client to walk away from the contract. My client's not maintaining that. Then why is materiality better? Because that point in time is what started the chain of events. Okay. But ultimately, doesn't the materiality question go to whether there was a breach that allowed essentially rescission of the contract or not? I mean, why are we asking the materiality question at all? Yes, Your Honor, is correct. But I don't think you look at that one breach in isolation because it's a culmination of all of the acts of Finova at that time, which was failure to decide upon the request to sell leases, the refusal of the advance request, and the minimum net cash flow. I see. So your position would be that those three things together constituted a material breach which then justified the refusal to give the audit and the refusal to pay interest and the refusal to pay the advances and so on. Correct. Because all three of those events occurred prior to my client ever refusing the audit, not paying the interest, and those things that happened down the line after this litigation had already ensued. If I may focus the Court's attention on the damages issue, I believe that Arledge Motor Company supported its claim for damages based upon its lost receivables with sufficient evidence to have justified and awarded that damage based upon the Court's finding of the breaches that it found. My client testified that in its business the receivables equaled the outstanding lease term on the contract, so it was the value that was contracted for in its current leases. We're not talking about future business that it was hoping to get. My client testified at trial that the company's historical collection rate was 80 to 90 percent, and this factored in the bad debt that could be associated with those leases, given my client's line of business of leasing vehicles to individuals with high-risk credit. However, 80 to 90 percent of that receivables was collected, and that was the historical proof of the company over a five-year period. Did the judge make a finding on the refusal to allow the sale of the leases? Did he make a finding?  Yes. And what was the finding? The court found that that was a breach of the contract to fail to respond to the decision or the request to sell the leases. Fail to respond to it, but that wouldn't be material unless the answer should have been yes, right? Oh, no. The judge never decided which way that should have come out. Uh-huh. The judge just said the failure to respond was a breach because the contract said the approval could not be unreasonably withheld. Yeah. But that request for permission to sell the leases was part and parcel with, and I want to go into a new line of business with new cars. I didn't see that as a freestanding request to sell the leases. Correct? You're referring to the May 20th letter. Yes. Separate and apart from that May 20th letter, through verbal conversations, my client had requested to sell leases, and those requests were made in conjunction with paying down the debt. I see. Then that was a freestanding request, not tied to I want to get into a line of business dealing with new cars as well as used. Correct. It was repeated discussions that my client had with Mr. DeWitt and the other individuals at Finova, and he kept asking because he was not getting a response back. If I may address the estoppel argument that the Court made, I don't believe that there's any facts in the record to support the Court's estoppel argument. Well, the Court said it didn't have an estoppel argument. The Court said it was just a discovery sanction. It's a discovery. Essentially. The Court used the word estoppel, and that's why I captured it in those terms. But essentially, they say the answer was that you didn't. That's quite aside from anything that happened before the lawsuit was filed, that you didn't come forward with this during the discovery period, and that was it. Correct. But that's not accurate. The Court implicitly found that my client should have taken the numbers, prepared a calculation, and then provided that spreadsheet in discovery. My client never did that, and there's no controverting evidence that my client had calculations that it was withholding. My client did produce the underlying information that was simply inputted into those calculations timely. Your Honors will recall Defendant's Exhibit 255 was a chart of various cash collections that my client put together from its monthly packets that was provided timely in the discovery process. At that point in time, all that was left to do was plug those numbers into a chart, into an Excel spreadsheet calculation. The Court found below that it was FANOVA's burden to do that calculation and to monitor the covenant. So timely during the discovery period, FANOVA had the same information that Richard had, which was the underlying cash that defendants were alleging was not included in the calculation. So the Court actually sanctioned my clients for not producing calculations, the Excel spreadsheet, that didn't exist at the time of their request made. Once they became available and actually in existence, my clients produced them within six days of their being produced, of their coming into existence. And plaintiffs argued below that this was surprise. But in Volume 1 of the record, when plaintiffs objected on this point, they said quite candidly, I haven't even looked at these spreadsheets since they were produced almost a year earlier. So I don't think it's fair for a party to get some information, whether it's late or not, stick their head in the sand and then say, well, surprise, because I haven't looked at it yet. They had over a year to look at it. Keep in mind there was a hearing in October where Mr. Arledge presented himself, took the stand, and testified as to these calculations, the same defendants' exhibits 292 that's at issue with the Court's ruling. And the plaintiffs at that time said, look, we don't have any questions for this witness on these calculations. So they had an opportunity to do the discovery they needed. And therefore, I don't think it's proper for the plaintiffs to say, well, surprise, we had them, we just didn't do anything with them. Roberts. Your time is running down. Why don't we hear from the other side, and then we'll make sure you have enough time to respond. Thank you, Justice. Your Honor, I have one. I'm Robert Simreau on behalf of Melville Capital Corporation. Would it make sense for Mr. Lurie to address the issues involving Acadia National Corporation before each of us split our 20 minutes, or how does the Court wish to handle that? He may or may not wish to address that in his argument. Why don't you use your time splitting it as you like, and then we'll hear from him in response. Thank you. Again, I'm Robert Simreau on behalf of FINOVA. I will be addressing the issues that arose out of the bench trial involving FINOVA. And are you splitting time? And I am splitting time with Mr. Howe. And how do you want to provide it? We're shooting for 15 minutes, 5 minutes. Okay. He's going to hold me to that, I'm sure. Okay. Two general points I want to make, and Judge Berzon made one of the points better than I ever could with respect to, does it really matter at this point with respect to, does FINOVA's performance of the net cash flow covenant, does that matter at this point? And we do not believe that it does. And similarly, we do not believe that the calculations that Judge Broomfield, in his discretion under Rule 37c1, refused. Because that goes to the same point. It goes to the same point. And I can't do it. It still goes to the calculations. You are entirely persuasive to me that it does. I've never understood it, and that was one of my frustrations with Judge Broomfield is I, you know, I tried to convince Judge Broomfield that I'm not sure that it mattered, but that the record is what the record is. His answer seems to be that it matters in understanding the materiality. I'm not sure I understand that answer, but can you respond to it? I disagree. Because the issue is, this is a little esoteric, but I believe we have a distinction between conditions and covenants here. And as I read Judge Broomfield's ruling, it really comes down to when FINOVA failed to perform, FINOVA failed to perform by refusing to fund the $34,000 advance request. And the wrongful, the real wrongful conduct of FINOVA, as Judge Broomfield saw it, was that judge, that FINOVA was relying, in failing to perform, FINOVA was relying upon a default which did not exist at that point. Because you had to. Because they did not allow a meaningful cure of the default. All right. So let's assume that for now. So they say that it isn't, that the $34,000 is only part of it. I guess there were two answers, both of which I'm interested in. I don't want to interrupt you. Before I forget, could I address that part? There is nothing. There is nothing in the record with respect to any finding concerning the balance of that funding request. There was. There was. It was a $70,000 total. $34,000 was to be a cash advance from the inventory line to buy inventory. The balance of $36,000 was to be transferred to the receivables line. But there was no argument, no finding ever made that FINOVA refused to allow that transfer. I don't even know if FINOVA allowed or did not allow that transfer. It just never came up at the trial. And certainly no argument was made that any conduct on the part of FINOVA with respect to the $36,000 was wrongful. So there's no evidence you're saying, no finding but no evidence you're saying? Correct. All right. What about the $34,000? $34,000. They're saying, as I understand your response to it, it's that essentially it was no never mind because they would have had a they were over-advanced anyway, and they say, well, that would have taken a while, and in the meanwhile they could have bought some inventory and sold it and improved their situation. The entire materiality issue, again, throughout this case, defendants have been obsessed with the net cash flow calculation. As far as they're concerned, the case ended began and ended in May of 2002. But there were events leading up to for an entire year leading up to that which put that request into its context with respect to the materiality issue. And in the standards, we both agree on the standards. It's Section 241 of the Restatement Second of Torts with respect to how severe is the breach. Are damages going to suffice to compensate the non-breaching party? Or is the breach so severe that the non-breaching party is excused from future performance? And the following evidence was presented to the district court, which we believe was persuasive. AMC had been losing money each month for over a year. Over the prior year, its collateral base had been reduced from $12.4 million to $6.5 million. For over a year, and I think this is an important point, for over a year, AMC had not requested any cash advances to buy inventory. Over the prior year, AMC had to make substantial over-advanced payments each month back to FINOVA ranging from $160,000 to over $483,000. And as Judge Berzon pointed out, I believe the time period is 10 days. If FINOVA had funded that $34,000, 10 days later, it would have had to have been repaid in addition to the over-advanced payment that was paid of $263,000 at the end of June 2002. So this magic $34,000 after a year of never having utilized the line, obviously the business is shrinking. From FINOVA's standpoint, it smelled something was not quite right. Perhaps this was a setup for a lawsuit, and perhaps FINOVA is right. But we argued at trial that in light of all this evidence, that FINOVA's breach did not fundamentally change the transaction. That's what it really comes down to. Did FINOVA do anything to fundamentally change the deal here so as to allow AMC to stop abiding by its contractual obligations? And there are some other elements that are relevant also under Section 241 of the Restatement Second. And that goes to the issues of good faith and whether FINOVA faced a forfeiture of significant contract rights should AMC be allowed to walk on its contract obligations. Again, we're talking in June 2002 when FINOVA refused to make the $34,000 funding request. Immediately thereafter, AMC and its owner, Richard Arledge, decided that they were going to take full advantage of this breach. In June 2002, as noted by Judge Fletcher, AMC denied FINOVA access for an audit. Also starting in June, AMC decided that it no longer had to make any further monthly loan interest payments. Also, they stopped making the loan over advance principal payments at that point, and the over advance ballooned from $72,000 in June 2002 to almost $1.2 million in September. Kagan. Can I ask another question, please? The other post-default breach they're claiming cumulatively created materiality was the failure to respond to the request for leases. Now, your brief says not word one about that, and I don't understand what your position is on it. I would struggle with that one to be candid with you. And I think, and let me put it in context. That initially came up, and it was a little bit of a surprise, but it came up in Judge Broomfield's ruling on the motion for partial summary judgment, wherein he found that FINOVA had improperly failed to respond to the request to sell leases. But it was in the context of that finding, again, was with respect to the cure, that the proposal, whether it was in conjunction with a new car franchise or an oral discussion, apart from those discussions. But it was in the context that Judge Broomfield viewed, again, that was another cure option, that that would have raised funds which would have allowed the ability of AMC to cure whatever net cash flow default may have existed at that point. So, again, it really ties into the cure issue, and I don't think it can be separate. Because everything ends up with that $34,000 advance on June 20th of 2002. You start with the May letter of May 2002. Supposedly, there were these discussions. Well, May 20th, the letter with respect to the request to sell leases coupled with, and by the way, I want to start a new car franchise. And then it ends with the funding, the refusal of FINOVA to fund in June 2002. Everything leads up to that. And there were many, many, many, many communications. Was the response to the request to sell the leases before or after the request from the $34,000, the $70,000? Before. It was before. It was after the default letter, before the refusal to make the funding. And it was in the context of cure, cure discussions. All these discussions were, there was a little bit of a dance going on, I think, between the parties on ---- No, but I don't see how that helps you. I mean, the ultimate thing we're trying to decide is whether the failure, in your view, i.e., that the cash flow issue doesn't matter, is whether the failure to cure, the default based on the failure to cure was material. And if they were refusing because of that default to allow them to do something that they should have allowed them to do, and that led to a spiral that made it to function, which is what I understand them to be arguing, then it would be material. So the fact that it's tied into the cures of no, never mind, the question is, was it material? Okay. Well, let's take a step back and focus on the evidence that was actually presented to the district court because that was a one-line finding on the leases. And in the context of the entire findings and conclusions, I don't believe that was an important, that important a finding to Judge Broomfield, but I may be wrong on that. But what is important is that – I apologize. I lost my train of thought. The question is, why isn't – why doesn't that contribute to the materiality? I mean, if there was a breach, if that was a breach and it had impact on – go ahead. Was it a breach or, given the context, because it was in the context of, according to the defendant's claim to raise funds to cure the default, was it, again, the – the – the – Finova's impropriety in allowing a cure of the default, I think that was just one more indicia of Finova improperly allowing the cure. Fine. But the question was the failure to allow the cure material. And they're saying, well, one way we were going to cure it was to sell the leases, and if we had been allowed to sell the leases, we wouldn't have gone into such bad situation as we did. I don't know whether that's true or not, but that's what I understand to be their argument. Yeah. I understand – I understand that argument. I'm not sure that that evidence came out in trial, and Judge Broomfield sure didn't deem it important enough to make a finding on that in terms of materiality because there – there was – there was one or two discussions about the leases, and it never – the problem is it just never developed to where a specific  Finova with respect to the sale of specific leases. That's the reason it really didn't go anywhere. And so it just was not that important an issue at trial. It would have been nice, I guess, had Judge Broomfield said that that – that was not a material issue. But everything was – Are you essentially saying they didn't prove it was material because they didn't prove that they actually could have sold the leases and gotten anything? I'm sorry. They didn't prove it was material because they didn't prove that they actually could have sold these leases and gotten anything for them that would have helped them? I think that's part of it. But part of it is everything leads up to the $34,000 funding request. All the materiality findings by Judge Broomfield come out of that – come out of that act. And I think everything else leads up to that. And that's the culmination of Finova's failure to perform. And that's what supposedly – I mean, if they sold the leases, they would – well, first of all, the only breach he actually found was not answering them. He never actually found it as a breach whether you should have let him sell or not let him sell. But second of all, the leases were the collateral, right? So if they were selling the leases, they were selling your collateral. And thereby changing the – what? I mean, I don't understand. It would change the formulation. And that was part of Ryan DeWitt of Finova. That was part of his testimony at trial. There was a – there was a proposal made to Mr. DeWitt, and Mr. DeWitt said, yeah, that's fine. You can sell all the leases you want, but it's all going to go to us, and it will affect the formulations under the – under the – the availabilities under the various lines of credit. So, yes, you're exactly right. And that evidence didn't come out, but Judge Bloomfield did not focus on it. And I will – and obviously the Court has picked up on it, but this whole appeal really is based upon – all of the issues are – arise from findings of fact made by Judge Bloomfield or exercises of his discretion. We do not believe that there was any clear error on Judge Bloomfield's part or an abuse of discretion. Real quickly on damages, with respect to damages arising from Finova's wrongful conduct, because there's no appeal – we have not pursued any appeal with respect to the damage award awarded us. Two serious problems in the damage analysis by AMC. Number one, the only evidence that was presented – well, first of all, there was a real problem. They had a damage expert testify to some lost profits, and then Mr. Arlitz got up in the sand and tried to testify about some other lost asset value, and the two didn't tie together very well. But ignoring that for the moment, there were two very serious problems with damages. First, the $1.4 million valuation for these leases, these accounts receivable, there was no evidence presented translating the lost revenue of $1.4 million into lost profits, reflecting what it would have cost to service the leases to collect the $1.4 million over time. Doesn't the damages testimony seriously overlap with the materiality issue? I mean, if you thought that you had proved that in fact your default caused this much damages, then it would be material. You're exactly right, and that's my final point. And that leads to my final point on damages, and that is the date that they've chosen of May 2002 for the valuation date. And there's a lot that happened between May 2002 and October 2002 when the UCC cell was conducted. And from our standpoint, it is improper to use the May 2002 date because it leads to materiality as to what happened in the meantime. Between May and October, the value of AMC's accounts receivable declined by $2.5 million, and a good amount of this decline was due to AMC liquidating its owner, Mr. Arledge, who was taking the money. He was taking he took approximately $643,000 during this time period for his own use. I mean, he was viewing it as a financial bonanza for him, and that leads back to the materiality standards under Section 241. Are the parties acting in good faith? Is FANOVA facing a substantial forfeiture of contract rights? And I left some time for Mr. Howey. Hopefully, we have. The Court has no further questions. I'm not sure how to attach a dollar figure to this. You owe him a minute and 30 seconds. Thank you, Your Honors. And may it please the Court. My name is Brian Howey, and I represent third-party defendant Applee Lucadia National Corporation. I wanted to start, Your Honors, by briefly reviewing a few issues that are not in dispute on this appeal with respect to Lucadia. One is that the only claim that's before this Court is the tortious interference claim. Another is that there is no suggestion on the part of AMC that the district court misapplied the substantive law with respect to tortious interference, and therefore, there's no dispute that AMC had to prove all five elements and bore the burden of proof ultimately on all five elements of the tortious interference claim. Third is there's no suggestion by AMC that the district court misapplied the legal standard under Rule 56, and therefore, there's no dispute that AMC had the burden as the nonmoving party below of coming forward with significant probative evidence that would be sufficient to demonstrate a genuine issue of material fact in support of each essential element of its claims. So the case then boils down to whether or not AMC met its burden under Salitex. And as the Supreme Court said in Salitex, the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims. And Lucadia submits that this is a classic case of a party, a nonmoving party below, simply failing to meet its burden under Salitex. I want to focus with the brief time I have on two of the elements of the tortious interference claim. Lucadia's position is that the district court correctly ruled that regardless of whether or not Lucadia was an agent of FANOVA, AMC failed to demonstrate essential elements of the tortious interference claim. And the two elements I'd like to focus on are interference and improper conduct. And I'll start with interference. AMC in its initial brief and its reply brief creates a certain amount of confusion, I think, over who at Lucadia, over whether Lucadia, Lucadia's involvement with the AMC loan at FANOVA. And there's two particular areas where I think there's some confusion that they're creating that I'd like to clarify for the Court. One is AMC repeatedly makes the assertion that Larry Hirshfield, who was a Lucadia employee but operated and acted as the CEO of FANOVA for about an 11-month period of time from 2001 to 2002, AMC asserts that Mr. Hirshfield made all decisions at FANOVA with respect to all of the loans and, therefore, Mr. Hirshfield made all of the decisions with respect to AMC loans. And the record evidence simply demonstrates that that is not the case. When asked specifically in his deposition what matters were brought to him, Mr. Hirshfield, for his approval, his answer was only significant matters. What was Mr. Hirshfield, a Lucadia employee? He was a Lucadia employee acting as the CEO of FANOVA, and he reported to the FANOVA board. And the record evidence was that he did not report to anybody else except the FANOVA board of directors. The matters that came to – let me – actually, let me step back a minute. With respect to a loan like AMC's loan, there is essentially two buckets of decision. One is – Okay. You're now out of time. We'll give you one minute to wrap it up. Okay. Thank you, Your Honor. Day-to-day decisions with respect to the existing terms of the loan and more significant decisions which would relate to restructuring the loan, extending the term of the loan, or expanding the amount of the line of credit. And the evidence demonstrated that Mr. Hirshfield was involved with only the significant decisions, and the day-to-day decisions were left to FANOVA employees. Mr. DeWitt's testimony, Mr. Gray's testimony, both of whom were FANOVA employees, as well as Mr. Narsutis' testimony, also a FANOVA employee, demonstrated that those individuals were the ones making – specifically Mr. Narsutis and Mr. DeWitt – those were the ones making the day-to-day decisions with respect to the AMC loan. And there simply was no evidence in the record that Mr. Hirshfield or anyone else at Lucadia took any action or made any decision or gave any instruction to FANOVA with respect to the AMC loan. Okay. Thank you. Thank you very much. Mr. Lurich, you've saved a little time, and we'll make sure you get enough time to respond. You've saved one. Could you set the clock at – could you set the clock at three minutes? Your Honor, regarding the site that I mentioned, I would provide the Court on FANOVA's supplemental excerpt of record, page 61. The Court found that AMC asked plaintiff for an amount that would allow it to cure, but was not given an amount. Okay. And that was in its holding on the summary judgment. Yeah, I saw that. Okay. Thank you. All AMC ever wanted was for FANOVA to honor the contract. That's what it was trying to do the entire time when it was asking to sell leases to cure and pay FANOVA that money off. So the Court is correct that – But what it was doing then was taking the collateral away. So it doesn't seem – obviously, I'm no expert in these kind of loans, but it would appear that if the loans are there as collateral and you sell them, you haven't advanced your position vis-a-vis the lender. Well, Arledge Motor Company was not going to sell the collateral without paying off FANOVA. I mean, it was obligated to do that. In fact, the money went directly to FANOVA when the collateral was sold. Okay. But wouldn't FANOVA be fairly indifferent as to whether it sat there as collateral or was sold and paid back to it? It's still – it doesn't improve your position vis-a-vis them, whether it's cash in their pocket or collateral that they can sell if they want to. Well, it should have because the testimony at trial was if Arledge Motor Company had been allowed to sell its leases, that would have been sufficient money at the time to pay the loan off in full. The balance was only $3.6 million, $3.4 million on the loan balance. The receivables was over $5.7 million. Had Arledge Motor Company been allowed to sell that – the collateral, the receivable list, it would have generated sufficient money to pay the loan off in full. So what reasonable lender would not want to be paid off in full? Now, was the request to sell off in full so as to just pay off the entire indebtedness? I didn't see that. It was a request to sell the leases. And the testimony was there was $5.7 million worth of total receivables and $3.4, $3.6 owed, and that if Arledge Motor Company had been allowed to sell the leases, it could have generated sufficient money to pay off in full. I don't think there was a specific request to sell one lease versus 20 leases versus 100 leases. What about – what about Mr. – Mr. Simbro's argument about the timing, about everything that happened between May and October of 2002 and how the leases, you know, decreased in value? Some of the leases did decrease in value. That's correct. Some of those leases were foreclosed in order to generate income so that Arledge Motor Company could survive. I mean, it had been completely shut off from its lender for many sources of funds, and so it – the only thing it had – Why doesn't that cut into your damage argument? Yes. But FINOVA should not reap the unintended benefit of its breach of contract. In other words, the Court has to determine the date that the breach is effective and when damage is run. We think the date should be calculated from when the breach has occurred, which are all in the May-June time period. FINOVA wants to say, well, let's – let's examine this in October four months later, and I don't think that's appropriate under the law. Just briefly on the Lucchetti issue, Your Honor, Lucchetti has sought to prove that it was an agent. Its own summary judgment proof fell far short of proving that it was FINOVA's agent. You know, I find – again, maybe I'm missing something here, but the – what you're saying about Hirschfield, i.e., that he was, what, the CEO and was an employee of – of Lucchetti at the time, why doesn't that make Lucchetti an agent? Their – their agent was – was running FINOVA, so – by your own version. So why isn't he – the company then an agent? There was no summary judgment proof that that was the state of the affairs. But that's what you say the state of the affairs are when you're – when you're trying to say that Hirschfield, on the – when you get further down the line in the argument, you say, but Hirschfield was, in fact, acting for Lucchetti and – and was responsible for this. I'm saying he was exerting control. Right. Lucchetti was exerting the control. That doesn't make them an agent. They were just doing it. We allege that that's part of the impropriety of their conduct, because that control led to the breaches of contract that Judge Broomfield found below. The – the evidence was – So he was an employee of Lucchetti. Is that – is that a dispute? No. He was also a – he was an agent of – of FINOVA at the time. I don't know if that's correct. He was an employee of FINOVA who established a credit committee that – Right. He was only an employee of Lucchetti? Mr. Hirschfield was an employee of Lucchetti. And he was the – the – the chief officer of FINOVA. That may be. I don't have that information in front of me. And therefore, he was not an agent of FINOVA? I think that the point is, is that the control that they were exerting was improper based upon the contract that Lucchetti has sought to prove. In other words, Lucchetti's summary judgment evidence didn't say he was the CEO. It said, based upon the management and services agreement, Lucchetti was FINOVA's agent. The management and services agreement specifically said that agency relationship only extended to the parent. It didn't make the leap down to the subsidiary. Okay. Okay. Thank you very much. Thank both sides for good arguments. The case of FINOVA Capital v. Arledge is now submitted for decision, and it will be in recess for the rest of the day.
judges: Tashima, Fletcher, Berzon